1     TONY WEST
       Assistant Attorney General
2     DENNIS K. BURKE
       United States Attorney
3     JOHN R. GRIFFITHS
       Assistant Branch Director
4     BRADLEY H. COHEN (DC Bar No. 495145)
       Trial Attorney
5     United States Department of Justice
       Civil Division, Federal Programs Branch
6     Post Office Box 883
       Washington, D.C.  20044
7     Tel: (202) 305-9855
       Fax: (202) 318-0486
8     bradley.cohen@usdoj.gov

9

                 UNITED STATES DISTRICT COURT
10
                    DISTRICT OF ARIZONA
11

12     HEIN HETTINGA AND ELLEN
       HETTINGA d/b/a SARAH FARMS,
13                         09-CV-00204-PHX-JWS
           Plaintiffs,
14
                        **DEFENDANT'S MEMORANDUM**
15           v.              **IN SUPPORT OF ITS MOTION FOR**
                        **SUMMARY JUDGMENT AND IN**
16     THOMAS J. VILSACK, in his capacity as    **OPPOSITION TO PLAINTIFFS'**
       Secretary of the UNITED STATES         **MOTION FOR SUMMARY**
       DEPARTMENT OF AGRICULTURE,        **JUDGMENT**
17
           Defendant.
18

19

20

21

22

23

24

25

26

27

28

1

**SUMMARY OF ARGUMENT**

2   Plaintiffs, Hein and Ellen Hettinga d/b/a Sarah Farms ("Hettingas") seek a declaratory

3   judgment that the Secretary of the U.S. Department of Agriculture ("Secretary") erred as a

4   matter of law in imposing minimum price requirements upon them for milk sold during the

5   month of April 2006, resulting in an assessment of $324.211.60 by the Milk Market

6   Administrator ("Administrator").   Plaintiffs' complaint alleges that the Secretary

7   misinterpreted a federal regulation, the Arizona-Las Vegas milk marketing order, which

8   defines who qualifies for the "producer-handler" exception to the regulation.  Compl. ¶ 33.

9   On February 24, 2006, the Administrator issued a final rule, effective on April 1, 2006, that

10  limited the definition of producer-handlers operating in the Arizona-Las Vegas and Pacific

11  Northwest milk marketing areas.  Specifically, the definition was limited to those who

12  operate a dairy farm and distributing plant and whose in-area route distributions of class 1

13  milk do not exceed 3,000,000 pounds per month.  71 Fed. Reg. 9430 (Feb. 24, 2006).  As

14  they freely acknowledge, the Hettingas' in-area route distributions of class I milk exceeded

15  3,000,000 pounds at that time and would continue to do so in April 2006.  Thus, according

16  to the plain language of the regulation, in April 2006, they were not eligible for the

17  regulatory exemption afforded producer-handlers and were required to pay the resulting

18  assessment.  Furthermore, even if there is some ambiguity in the regulation, the Secretary's

19  interpretation that plaintiffs never qualified as a producer-handler under the new regulation,

20  and thus were required to pay the assessment as of April 1, 2006, the effective day of the

21  regulation, is entitled to deference.  Because there is no genuine dispute as to any material

22  fact and, even viewing the exhibits and testimony in the light most favorable to the Hettingas,

23  their claim fails as a matter of law, and judgment should be entered in favor of the Secretary.

24  **STATUTORY AND REGULATORY BACKGROUND**

25  **I.    The Federal Regulation of Milk**

26  Through the Agricultural Marketing Agreement Act of 1937 as amended, see 7 U.S.C.

27  § 601 et seq. (the "AMAA"), Congress empowered the Secretary of Agriculture to regulate

28

1

persons who handle agricultural commodities, including milk products.  See id. § 608c(1)-(2).  Congress authorized the regulation of such persons, known as "handlers," through agricultural marketing orders to further several policy objectives, including establishing and maintaining orderly marketing conditions for agricultural commodities, see id. § 602(1), protecting consumers of agricultural commodities, see id. § 602(2), as well as avoiding unreasonable fluctuations in supplies and prices by maintaining an orderly supply of agricultural products throughout the seasons, see id. § 602(4).

With regard to milk, the AMAA authorizes the Secretary of Agriculture to establish milk marketing orders to regulate different geographic regions of the country.  See id. §§ 608c(1), (5).  This authority includes the ability to guarantee dairy farmers (referred to as "producers") a minimum uniform price for milk sold to handlers, regardless of the milk's ultimate use.  Id. §§ 608c(5)(A)-(c).  Pursuant to the AMAA, the Secretary of Agriculture has issued several milk marketing orders for many geographic regions of the United States, including Order 131, which governs the Arizona geographic region.  See, e.g., 7 C.F.R. §§ 1131.1 -.86 (providing regulations specific to Order 131).

On the handler side, a 'pool' or 'settlement fund' is created to take into account the end use of milk purchased at the blend price.  See 7 C.F.R. § 1000.70 (providing for the settlement fund).  Handlers pay into the settlement fund to the extent that the average end-use value of their milk products exceeds the blend price.  See Lehigh Valley Farmers v. Block, 829 F.2d 409, 412 (3d Cir. 1987); Schepps Dairy, Inc. v. Bergland, 628 F.2d 11, 15 (D.C. Cir. 1979); see, e.g., 7 C.F.R. § 1131.71 (providing for handler payments into the settlement fund for Order 131).  Handlers whose average end-use value of their milk products is below the blend price receive payments from the settlement fund.  See Lehigh Valley, 829 F.2d at 412; Schepps Dairy, 628 F.2d at 15; see, e.g., 7 C.F.R. § 1131.72 (providing for payments to handlers from the settlement fund for Order 131).  The net effect of these payments is that "each handler pays for his milk at the price he would have paid had it been earmarked at the outset for the use to which it was ultimately put."  Lehigh Valley Coop. Farmers, Inc. v.

1  United States, 370 U.S. 76, 81 (1962); see also 7 U.S.C. § 608c(5)(c) (requiring that "the

2  total sums paid by each handler shall equal the value of milk purchased by him at the prices

3  fixed . . ."); Lamers Dairy Inc. v. USDA, 379 F.3d 466, 470 (7th Cir. 2004).

4  **II.     Exceptions to the Pooling and Pricing Obligations**

5  Prior to April 1, 2006, there were two loopholes that would allow even the largest

6  handlers to avoid the pooling and pricing obligations.  First, when a handler located in a

7  federally regulated marketing order sold milk into an area subject to state regulation, those

8  sales were exempt from federal (and state) pool payment obligations.  Second, where a

9  handler's operations were so thoroughly integrated with the production side that the entire

10 business – from cow to consumer – did not rely on federal minimum price guarantees, it was

11 exempt from the pooling and pricing obligations.  See Edaleen Dairy, LLC v. Johanns, 467

12 F.3d 778, 780 (D.C. Cir. 2006).  Historically, the entities qualifying for this so-called

13 producer-handler exception were small family businesses, and their use of the exception did

14 not disrupt orderly milk market conditions. See id.; Stew Leonard's v. Glickman, 199 F.R.D.

15 48, 50 (D. Conn. 2001).  In recent years, however, the allure of the competitive advantage

16 from the producer-handler exception (not having to make payments to the settlement fund)

17 has motivated entities with large-scale dairy operations to exploit the exception. See Edaleen

18 Dairy, 467 F.3d at 780.

19 **III.    The February 2006 Amendments to USDA Regulations for Order 131**

20 In February 2006, the Secretary of Agriculture redefined the producer-handler

21 exception for Order 131 so that large producer-handlers are no longer exempt from the

22 Order's pooling and pricing requirements.  See *Milk in the Pacific Northwest and Arizona-*

23 *Las Vegas Marketing Areas; Order Amending the Orders*, 71 Fed. Reg. 9430 (Feb. 24,

24 2006).[1]    Under the amended regulatory definition, handlers with in-area monthly milk

25

26    [1]

27 Congress later incorporated this new definition in the Milk Regulatory Equity Act, which
   amended the AMAA by limiting the exceptions to the pooling and pricing obligations.  See

28                                              3

1   distributions of over three million pounds no longer qualify as exempt producer-handlers.

2   71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10).  As a result, large producer-

3   handlers in Arizona are now subject to the same pooling and pricing requirements that apply

4   to all handlers.  <u>See</u> 71 Fed. Reg. at 9430.

5         Before implementing the February 2006 rule, USDA issued a proposed rule, heard

6   testimony, and made findings regarding the need and appropriateness of amending the

7   producer-handler exception for Order 131.  <u>See</u> *Milk in the Pacific Northwest and Arizona-*

8   *Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing*

9   *Agreement and to Orders*, 70 Fed. Reg. 74166-91 (Dec. 14, 2005).  As a result of that

10  process, USDA concluded that contrary to the AMAA's goal of achieving orderly milk

11  markets, an uncapped producer-handler exception in the Arizona region was contributing to

12  significant market instability.  <u>See</u> 70 Fed. Reg. at 74185-86; <u>see also</u> <u>id.</u> at 74188 ("This

13  decision finds that disorderly marketing conditions exist in the Pacific Northwest and the

14  Arizona-Las Vegas marketing areas.").[2]

15        In addition to these findings on the disruptive effects of an uncapped producer-handler

16  exception, USDA also concluded that a central rationale underlying the producer-handler

17  exception no longer applied to the large producer-handlers.  A justification for exempting

18  producer-handlers from the pooling and pricing requirements was that they bore the burden

19  of disposing of their surplus milk – milk that they processed, but could not sell as fluid milk.

20  But, that rationale ceases to exist for large producer-handlers because by not having to pay

21  into the settlement fund, they can price their milk so that all of it can be sold as highly

22
23  Pub. L. No. 109-215, 120 Stat 328 (Apr. 11, 2006) (codified at 7 U.S.C. § 608c(5)(M)-(N)).
    In particular, subsection (N) regulates milk handlers in Order 131.  Under subsection (N),
24  handlers (including producer-handlers) with a monthly disposition of over three million
    pounds of Class I milk products from their own farms are subject to the minimum pooling
25  and pricing requirements.  <u>See</u> 7 U.S.C. § 608c(5)(N).

26        [2]  USDA concluded that the evidence before it would have supported a decision to phase
    out the producer-handler exception at an even lower monthly milk volume – 150,000 pounds –
27  one-twentieth of the current three-million pound cap.  <u>See</u> 70 Fed. Reg. at 74186.

28                                      4

profitable fluid milk.  <u>See</u> 70 Fed. Reg. at 74187.  Thus, USDA found that the competitive advantage from the producer-handler exception is so great that it allows large producer-handlers to avoid the risks traditionally associated with producer-handler status.  <u>Id.</u>

**FACTS RELEVANT TO PLAINTIFFS' CLAIMS**

**I.      The Hettingas' Operation of Sarah Farms**

Plaintiffs Hein and Ellen Hettinga own and operate Sarah Farms, a large dairy business in Arizona.  Defendant's Statement of Facts ("DF") at ¶ 1 (Judicial Officer Decision and Order, Administrative Record ("AR") Tab No. 38 at 8).[3]  Sarah Farms is an integrated producer and handler that produces milk on farms owned by the Hettingas and processes that raw milk into bottled milk for sale directly to consumers, milk dealers, and retailers.  DF at ¶ 2.  From 1994 until April 1, 2006, Sarah Farms qualified as a "producer-handler" of milk and was exempted from complying with the pooling and pricing obligations of the federal milk marketing order that covered Arizona.    DF at ¶ 3; <u>see</u> JO Decision and Order, AR Tab No. 38 at 9.   However, as described above, the regulations that became effective April 1, 2006 subjected producer-handlers operating in the Arizona-Las Vegas and Pacific Northwest milk marketing areas to the pricing and pooling provisions of their respective milk marketing orders if they had in-area route distributions of class I milk in excess of 3,000,000 pounds per month.  DF at ¶ 4; <u>see</u> 71 Fed. Reg. 9430 (Feb. 24, 2006).  As the Hettingas readily acknowledge, Sarah Farms sells more than 3,000,000 pounds per month in the geographic area covered by Order 131.  DF at ¶ 5; <u>see</u> <u>also</u> Plaintiffs' Statement of Material Facts ("PF") ¶¶ 13, 19; Compl. ¶ 19. Following adoption of the final rule, the Administrator imposed minimum price requirements upon the Hettingas for milk sold during the month of April 2006, resulting in a pool payment of $324,211.60.  AR Tab No. 38 at 9.

---

[3]  Defendant filed the Administrative Record (*In re: Hettinga d/b/a Sarah Farms*, AMA-M Docket No. 08-0071) with this Court on June 1, 2009.  <u>See</u> Doc. No. 12.  References to documents in the AR are hereinafter referred to by Tab number (Tab No.) and page number.

1

## II.      Prior Administrative Proceedings

2       On March 7, 2008, the Hettingas instituted an administrative proceeding under the

3 AMAA, seeking a determination that the Market Administrator misinterpreted and

4 misapplied the federal order regulating the handling of "Milk in the Arizona-Las Vegas

5 Marketing Area" (7 C.F.R. pt. 1131 (April 1, 2006)) by imposing minimum price

6 regulations upon the Hettingas for the month of April 2006.  DF at ¶ 7; AR Tab No. 1.

7 On November 17, 2008, the Administrative Law Judge (ALJ) issued a Decision and

8 Order in which the ALJ concluded that the Market Administrator's imposition of

9 minimum price regulations upon the Hettingas for the month of April 2006 "was

10 appropriate and in accordance with law based upon the revisions to Milk Marketing

11 Order;" the Judge therefore denied the relief and dismissed their claim with prejudice.

12 DF at ¶ 8; AR Tab No. 32 at 7-8.  The rationale behind this decision was that the new

13 regulation "changed the definition of producer-handler in such a way as to make the

14 [Hettingas] no longer eligible for the regulatory exemption afforded producer-handlers."

15 Id. at 5.  On January 15, 2009, this decision was affirmed by the Judicial Officer for

16 precisely the same reason (i.e., the Hettingas' in-area route distribution exceeded

17 3,000,000 pounds for April 2006 which precluded them from qualifying as a producer-

18 handler).  See DF at ¶ 9; A.R. Tab No. 38 at 12, 15.

## STANDARD OF REVIEW

19

20       Summary judgment is appropriate when "there is no genuine issue as to any

21 material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ.

22 P. 56(c).  Review of agency action under the Administrative Procedure Act can usually be

23 resolved through summary judgment, because the reviewing court does not engage in

24 factfinding of its own; the Court's only task is to determine whether the agency's action

25 was permissible on the basis of the governing law and the factual record compiled by the

26 agency. See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985) ("The task

27 of the reviewing court is to apply the appropriate APA standard of review to the agency

28

1  decision based on the record the agency presents to the reviewing court." (citation

2  omitted)).

3        Judicial review of the actions of an administrative agency under the Administrative

4  Procedure Act is highly deferential.  A court reviewing an agency's action under the APA

5  may not "substitute its judgment for that of the agency" merely because the court

6  disagrees with what the agency has done.  <u>Public Citizen v. Nuclear Regulatory Comm'n</u>,

7  573 F.3d 916, 923 (9th Cir. 2009) (internal quotations and citation omitted). Rather, a

8  court may set aside agency action only if the action is "arbitrary, capricious, an abuse of

9  discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

10        Here, Plaintiffs are challenging the USDA's interpretation and application of its

11  own regulations.  A reviewing court must "give substantial deference to an agency's

12  interpretation of its own regulations." <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504,

13  512 (1994).  The Supreme Court has explained:

14      Our task is not to decide which among several competing interpretations
    best serves the regulatory purpose. Rather, the agency's interpretation must

15      be given "'controlling weight unless it is plainly erroneous or inconsistent
    with the regulation.'" In other words, we must defer to the Secretary's

16      interpretation unless an "alternative reading is compelled by the
    regulation's plain language or by other indications of the Secretary's intent

17      at the time of the regulation's promulgation." This broad deference is all the
    more warranted when . . . the regulation concerns "a complex and highly

18      technical regulatory program," in which the identification and classification
    of relevant "criteria necessarily require significant expertise and entail the

19      exercise of judgment grounded in policy concerns."

20  <u>Id.</u> (citations omitted); <u>see also</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997).  Review of

21  the Secretary's decision is limited to whether the decision is "supported by substantial

22  evidence and is in accordance with law."  <u>Lehigh Valley Farms</u>, 829 F.2d at 412; <u>see</u> <u>also</u>

23  <u>Lansing Dairy, Inc. v. Espy</u>, 39 F.3d 1339, 1355 (6th Cir. 1994).

24                     **ARGUMENT**

25  **I.**    **Plaintiffs Were Not a "Producer-Handler" under the Plain Language**
      **of the Regulation That Became Effective April 1, 2006**

26

27        Plaintiffs concede, as they must, that because they distribute more than 3 million

28                          7

pounds of milk per month in the Arizona-Las Vegas milk marketing area, they "ceased to be eligible for the producer-handler exemption" when the new regulations came into effect on April 1, 2006. PF ¶ 16. They nevertheless contend that they are entitled to a refund of the amounts they paid to the Milk Market Administrator's Office for the month of April 2006 because, in their view, the Administrator was required under 7 C.F.R. § 1131.10(c) to provide a month's notice of the "cancellation" of their status as a producer-handler.

This argument cannot be reconciled with the plain language of the new regulations. The Hettingas could only qualify as a producer-handler if they operated a dairy farm and a distributing plant "from which there is route distribution within the marketing area during the month not to exceed 3 million pounds" ***and*** if the marketing administrator designated them as a producer-handler. 7 C.F.R. § 1131.10. If, as the Hettingas concede, they failed to meet the first part of this definition, the second part (whether or not they were designated and/or whether this designation was cancelled) is simply irrelevant. As the ALJ succinctly explained, the February 24, 2006 regulation "changed the definition of producer-handler in such a way as to make the [Hettingas] no longer eligible for the regulatory exemption afforded producer-handlers." AR Tab 32 at 5 (ALJ Decision and Order); <u>see also</u> Tab 38 at 12 (Judicial Officer Decision and Order agreeing with the ALJ's interpretation).

**II.    Plaintiffs' Cause of Action Should Also Be Rejected Because The Secretary Could Not Cancel a Producer-Handler Designation Which Plaintiffs Never Applied For and Which Never Existed**

**A.    The Language of the Cancellation Provision is Irrelevant to this Dispute Because Plaintiffs Were Never Designated a Producer-Handler Under the New Regulations.**

Plaintiffs assert that the "plain language" of 7 C.F.R. § 1131.10(c) somehow required the Department of Agriculture to affirmatively "cancel" their purported "status" as a producer-handler exempt from pooling and pricing obligations. Pl. Mem. at 7-9. In support of this proposition, they state that "[i]f someone had producer-handler status, then

8

the only way to terminate that status is by cancellation." <u>Id.</u> at 8.  However, as the

Judicial Officer explained:

> The Administrator amended the definition of the term "producer-handler" in the Arizona-Las Vegas Milk Marketing Order to include provisions for the market administrator's designation of persons as producer-handlers and cancellation of the producer-handler designation.  The market administrator never designated the Hettingas as a producer-handler under the April 1, 2006 definition of "producer-handler."  The Arizona-Las Vegas Milk Marketing Order provides that the designation of producer-handler shall be cancelled by the market administrator under certain circumstances ( 7 C.F.R. § 1131.10(c)(2007)).  Logically, the market administrator cannot cancel a designation that does not exist.  Therefore, as the Hettingas were never designated as a producer-handler under the April 1, 2006, definition of "producer-handler," the ALJ correctly concluded that the market administrator could not cancel the producer-handler designation of the Hettingas.

AR Tab 38 at 11-12.  The simple fact is that Plaintiffs never were (and certainly never

were designated as) a producer-handler under the new regulations that became effective

on April 1, 2006.  Thus, there was nothing for the Administrator to cancel, and the

cancellation procedures therefore did not apply.

This conclusion finds further support in the language of the cancellation provision

itself.  It states that the "designation as a producer-handler shall be canceled upon

determination by the market administrator that any of the requirements *of paragraph*

*(a)(1) through (5) of this section* are not continuing to be met, or under any of the

conditions *described in paragraphs (c)(1), (2) or (3) of this section*."  7 C.F.R. §

1131.10(c) (emphasis added).  The conditions and requirements referred to do not even

relate to the threshold definition of an exempt producer-handler, set forth in the preamble

of 7 C.F.R. § 1131.10, as a person with monthly in area distributions that do not exceed 3

million pounds.  They are *additional* requirements that a person must meet in order to

obtain or maintain a designation as producer-handler exempt from the pooling and pricing

obligations.  This dispute had nothing to do with whether Plaintiffs satisfied the

requirements of paragraph (a)(1) through (5) or the conditions set forth paragraphs (c)(1),

(2) or (3) of the regulations.  Again, the cancellation paragraph simply does not apply.

Plaintiffs were simply not an exempt producer-handler in April 2006, as the regulations

9

1  define that term.[4]

2  **B.  Plaintiffs' Fixation on the Distinction between "Status"
3      and "Designation" Is Also Not Germane to this Court's
       Determination**

4

5      Plaintiffs allege that the Administrative Law Judge and Judicial Officer erred by

6  concluding that § 1131.10(c) only applies to cancellation of the "designation" of

7  producer-handler.  Pl. Mem. at 11-14.  This misapprehends both opinions.  The ALJ

8  explained that the Hettingas had failed to apply for and the market administrator did not

9  "designate[]" them as a "producer-handler."  See AR Tab 32 at 7.  Essentially, the ALJ

10 was saying the Hettingas had failed to meet the second criterion of the preamble of the

11 Arizona Milk Marketing Order that went into effect on April 1, 2006.  See AR Tab 40,

12 Exhibit RX-8.  The JO opinion affirmed the ALJ's conclusion and explained:

13      The purported imprecision of United States Department of Agriculture
14      employees when using the terms "designation" and "status" is not relevant
        to the disposition of the instant proceeding.  The final rule, which amended
15      the definition the term "producer-handler," requires that in order for a
        person to be a "producer-handler," the market administrator must designate
16      that person as a producer-handler after determining that all of the
        requirements of 7 C.F.R. § 1131.10 have been met.  The Hettingas were
17      never designated by the market administrator as a producer-handler.  The
        purported imprecise language used by United States Department of

18

19      [4]  Plaintiffs cite In re H.P. Hood, 64 Agric. Dec. 1282, 2005 WL 6231897 (U.S.D.A. Oct.
20 26, 2005), see Pl. Mem. at 10-11, for the proposition that an agency interpretation "directly
   contrary" to a regulation is not entitled to deference.  This idea – that when there is no ambiguity
   in a regulation and an agency takes an action which directly contravenes the language of the
21 regulation – is not earth-shattering, see Thomas Jefferson Univ., 512 U.S. at 512, but it does not
   support plaintiffs' proposed interpretation of the regulation.  The initial requirement that in-route
22 distribution is "not to exceed 3 million pounds" to qualify as a producer-handler as of April 1,
   2006 is clear and unambiguous.  Ironically, only if the Secretary had ordered the relief plaintiffs'
23 seek (i.e., that they be deemed a producer-handler for the month of April 2006, even though they
   do not meet the clear regulatory definition in effect during that month, and then have that
24 designation cancelled, with cancellation effective the following month), would the Secretary
   arguably have violated the plain language of its regulations.  In any event, even if the Court were
25 to find the regulations ambiguous, the Secretary's reasonable interpretation would be entitled
   to deference.  See id. ("agency's interpretation must be given 'controlling weight unless it is
26 plainly erroneous or inconsistent with the regulation.'") (internal citations omitted); Department
   of Health & Human Services v. Chater, 163 F.3d 1129, 1133 (9th Cir. 1998) ("[W]e must give
27 substantial deference to an agency's interpretation of its own regulations because its expertise
   makes it well-suited to interpret the language.").

28

1  Agriculture employees does not change the fact that, as a matter of law, on
2  and after April 1, 2006, the Hettingas were not a producer-handler under the
   Arizona-Las Vegas Milk Marketing Order.

3  AR Tab 38 at 13-14.  As the Judicial Officer rightly pointed out, it is ultimately irrelevant

4  whether plaintiffs had producer-handler "status" prior to April 1, 2006.  The second

5  criterion for qualifying for the producer-handler exemption under the Arizona-Las Vegas

6  Milk Marketing Order that went into effect on April 1, 2006 was that the market

7  administrator designate the producer-handler after determining that all of the

8  requirements had been met.  <u>See</u> AR Tab 40, Exhibit RX-8.  As they readily admit, the

9  Hettingas never applied to or were designated by the market administrator as a producer-

10 handler after April 1, 2006.  Even had they applied, it would not have mattered because

11 the evidence before the ALJ and JO clearly established that their Class I route disposition

12 per month was substantially greater than 3 million pounds, <u>see</u> AR Tab 24 at 2, so as of

13 April 1, 2006, the Hettingas were not a "producer-handler."  Hence, the milk

14 administrator's imposition of the pooling and pricing requirements for milk sold during

15 the month of April 2006 was lawful under the Secretary's regulations.

16                                    **CONCLUSION**

18       For the foregoing reasons, the Court should grant summary judgment in favor of

19 Thomas J. Vilsack, Secretary of the U.S. Department of Agriculture and dismiss

20 Plaintiffs' claims in their entirety.

24 Dated: October 8, 2009                    Respectfully submitted,

25                                           TONY WEST
26                                           Assistant Attorney General

27                                           DENNIS K. BURKE
                                             United States Attorney
28                                                   11

SHARLENE DESKINS
United States Department of Agriculture
Office of General Counsel
1400 Independence Ave., S.W.

Washington, D.C. 20250

JOHN R. GRIFFITHS
Assistant Branch Director

 /s/ *Bradley H. Cohen*

BRADLEY H. COHEN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 305-9855
Fax: (202) 318-0486
bradley.cohen@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2009, I caused a copy of the foregoing Notice of

Appearance to be electronically transmitted to the Clerk's Office using the CM/ECF

System for filing and transmittal of a Notice of Electronic Filing to the following

CM/ECF registrants:

Alfred W. Ricciardi

Aiken Schenk Hawkins & Ricciardi P.C.

4742 North 24th Street, Suite 100

Phoenix, Arizona 85016

(602) 248-8203

October 8, 2009                              _/s/ *Bradley H. Cohen*_____

13